**40**

McCOMB, Administrator of Wage and Public
Contracts Divisions of U. S. Dept. of
Labor, v. McKAY et al.
No. 13517.

Circuit Court of Appeals, Eighth Circuit.
Nov. 4, 1947.

John J. Babè, Asst. Sol., U. S. Dept. of
Labor, of Washington, D. C. (William S.
Tyson, Sol., U. S. Dept. of Labor, of Washington, D. C., and Reid Williams, Regional
Atty., U. S. Dept. of Labor, of Kansas
City, Mo., on the brief), for appellant.

G. C. Holdrege, of Omaha, Neb. (C. B.
Matthai, of Omaha, Neb., on the brief),
for appellees.

Before SANBORN, THOMAS, and
JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

The Administrator of the Wage and
Hour Division, United States Department
of Labor, brought this action to enjoin the
appellees (who will be referred to as "the
McKays") from violating the Fair Labor
Standards Act of 1938, 52 Stat. 1060, 29
U.S.C.A. § 201 et seq. The McKays were
charged with having failed (1) to keep
proper records as required by § 11(c) of the
Act, 29 U.S.C.A. § 211(c), and (2) to pay
their employees overtime compensation as
provided by § 7(a), 29 U.S.C.A. § 207(a).
The defense of the McKays was that the
employees in suit were employees of the
Union Pacific Railroad Company and were
unaffected by § 7, which, by the terms of
§ 13(b) (2) of the Act, 29 U.S.C.A. § 213
(b) (2), is inapplicable to "any employee
of an employer subject to the provisions of
Part I of the Interstate Commerce Act,"
41 Stat. 474, 49 U.S.C.A. § 1 et seq.

The case was tried upon evidence which
was virtually undisputed and much of
which was stipulated. It was agreed that
the employees in suit had not been paid
overtime compensation as required by §
7(a), and that the McKays had not kept
the records required by § 11(c). The District Court determined that the employees
were not employees of the McKays, and
that the McKays and their alleged employees were employees of the Union Pacific Railroad Company, an employer subject to the provisions of Part I of the
Interstate Commerce Act. Walling v. McKay, 70 F.Supp. 160. The action was dis-

missed, and from the judgment of dismissal this appeal is taken.

The appellant contends (1) that, under the evidence and the applicable law, the employees in suit are employees of the Mc-Kays within the meaning of the Fair Labor Standards Act,[1] and (2) that, in any event, the employees are entitled to the benefits of § 7 of the Act, since the exemption contained in § 13(b)(2) is inapplicable to them.

The railroad maintains upon its right-of-way at Sidney, Nebraska, a yard for the manufacture, repair and storage of temporary grain doors and coal doors for freight cars. The McKays supervise the operation of the yard under an arrangement with the railroad.[2] The doors are used in connection with the transportation of grain and coal in bulk, both in interstate and intrastate commerce. The yard, which contains a small structure used in its operation, and all the necessary materials, tools, and equipment for the manufacture, repair and storage of the doors, belong to the railroad, except that the men employed to work in the yard supply their own hatchets. A tractor used in moving cars upon the spur track which serves the yard is owned by the McKays. They furnish the gasoline to operate the tractor. The railroad furnishes the electricity for power and light and all of the lumber, nails, and other material for making and repairing the doors. The manual labor is done by crews of from five to ten workers, and occasionally as many as fifteen. The members of the crew are selected, hired, supervised, paid, and discharged by the McKays. The employment records are kept by them, and they withhold amounts from the wages of the employees for income taxes and taxes under the Carriers Taxing Act of 1937, 45 U.S.C.A. §§ 261–273. The amounts withheld from the employees' wages are accounted for by the McKays to the Treasurer of the railroad on the first of each month. The railroad pays the amounts withheld to the Collector of Internal Revenue, and furnishes each of the employees with a "Withholding Receipt for Income Tax Withheld on Wages."

The work done by the employees consists of unloading cars of lumber, running the lumber through a power saw to cut it into specified lengths, stacking the lumber, making and repairing doors according to specifications furnished by the railroad, stacking completed doors, and loading such doors into freight cars. The work of making doors does not require much skill, but is "hammer and nail work." For unloading, sawing and stacking lumber and for loading and unloading car doors, the employees are paid by the hour, but for making car doors they are paid on a piecework basis. The employees receive their pay weekly from the McKays. The employees are paid overtime compensation for work in excess of eight hours per day, but only on that basis.

The McKays are paid monthly by the railroad for all work done in the yard on the basis of unit prices, which have been adjusted from time to time to reflect changes in costs of production and wage increases granted railroad employees. The McKays present a monthly bill to the railroad, which it pays within twenty days. The McKays deposit the money received in a joint bank account upon which either may draw. The account is carried under the name "McKay Brothers, Arthur E. and Elmer O." They do not wait for the payment of their bill by the railroad before paying the employees.

---

[1] The pertinent provisions of the Act are the following, 52 Stat. 1060, 29 U.S.C.A. § 203:

"Sec. 3. As used in this Act—

\* \* \* \* \* \* \*

"(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include the United States or any State or political subdivision of a State, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

"(e) 'Employee' includes any individual employed by an employer.

\* \* \* \* \* \* \*

"(g) 'Employ' includes to suffer or permit to work."

[2] Prior to the spring of 1942 the operations were carried on at Cheyenne, Wyoming, and thereafter at Sidney, Nebraska.

The operations in the yard at Sidney are under the direct supervision of R. J. Murphy, Assistant General Storekeeper of the railroad, stationed at Denver, Colorado. All of the material for the doors is purchased by the railroad and charged to "Union Pacific Storekeeper, Store 38, Sidney, Nebraska." The McKays do not order lumber. The loading and unloading of cars in connection with the operations in the yard are directed by the Storekeeper of the railroad at Sidney. He gives the necessary switching orders. The McKays do not place such orders. After cars of lumber are unloaded and the lumber is sawed and stacked, the Storekeeper at Sidney instructs the McKays, on the basis of the railroad's requirements, whether to make grain doors or coal doors or to load the lumber out for use at other points on the railroad. The McKays may be directed by the Storekeeper to cease making one type of door and to make another type or to stop making doors. He may direct them to load or unload cars instead of making doors. He also controls the order in which cars are to be unloaded.

When grain doors stored at Sidney are needed at some other point, the railroad agent at that point forwards a requisition to the railroad superintendent, which, after approval by him, is sent to the Storekeeper at Sidney, who orders the necessary cars set in and directs the McKays how to load them.

R. J Murphy inspects the yard at intervals for fire and other hazards. The McKays obey his directions for eliminating such hazards. The Storekeeper at Sidney makes a check in the yard every morning to determine the number of doors which were made the previous day. He then prepares a "store order notification and receipt in triplicate, acknowledging a given number of grain doors or coal doors, and has either of the McKays that are there sign where it says 'Foreman.'" The Storekeeper then signs the notification and receipt as "Stockman." One of the triplicates is given to the McKays, the Storekeeper retains one, and the third goes to the Auditing Department of the railroad at Omaha, to be used in verifying the McKays' monthly bill. Payment for the work done upon an hourly basis, such as the sawing of lumber and the loading and unloading of cars, is based upon a report of the railroad's "inspector-in-the field" as to the amount of lumber loaded into each car shipped by the railroad to the yard at Sidney.

For each of the years 1944, 1945 and 1946, the railroad gave to the McKays "Standing Orders." The one for the year 1946 may be taken as typical. It reads:

"Union Pacific Railroad Company
"Purchasing Department
"G. T. Wickstrom
"General Purchasing Agent
"Order No. 17–X–140
"Omaha, 2, Nebr.,
"1–2–46
"McKay Brothers, Contractors
"Box P.O. 104
"Sidney, Nebraska
"Please furnish the following and ship to Union Pacific Railroad Company, care of Store 38, Sidney, Nebraska.
"Ship via:
"Standing Order—Year 1946
"To cover manufacture, repair, and storage of temporary grain and coal doors and sawing of lumber at Sidney, Nebraska.
"In consideration of work when performed, R.R. Company will pay: [Here follows a list of unit prices to be paid for work "when performed."]

&ast; &ast; &ast; &ast; &ast; &ast;

"G. T. Wickstrom,
"General Purchasing Agent."

The orders did not specify the amount of work to be performed.

Prior to 1944 the arrangement between the railroad and the McKays was evidenced by written contracts. It is necessary to refer only to the contract of April 24, 1942. In it the McKays were called "Contractors." The contract provided:

"The Contractors shall, during the term hereof, furnish (except as herein otherwise specifically provided) all superintendence, labor, tools, plant and equipment, and shall in an expeditious, substantial and workmanlike manner to the satisfaction and acceptance of the Railroad Company—

"(a) manufacture, repair and/or store all temporary grain doors and temporary coal

doors which the Railroad Company may desire to have manufactured, repaired and/or stored; and

"(b) handle from cars or piles to saw, saw to proper lengths and widths and pile after sawing, all lumber required by the Contractors in connection with the manufacture and repair of temporary grain doors and temporary coal doors for the Railroad Company, * * *."

The contract required the "Contractors" to make and repair doors in accordance with the railroad's specifications; to make good defects in workmanship; to "increase or decrease their forces at any time, as the occasion may demand, when such increase or decrease in said forces of the Contractors is desired by the Railroad Company"; to unload, saw and pile all lumber; to unload and pile doors delivered for repair and for storage; to furnish tools and appliances not furnished by the railroad; to personally supervise the work; to comply with all applicable State and Federal laws regarding Employers' Liability, Workmen's Compensation, and Workmen's Insurance; and to accept exclusive liability for the payment of any payroll taxes or contributions. The contract also provided that "The Contractors are masters in respect to all the work done by them as herein provided, and the Contractors' servants and

employees are not the servants and employees of the Railroad Company in any particular whatsoever."

By the terms of the contract, the railroad agreed to deliver at the site of the work such doors as it desired to have stored, the lumber for making and repairing such doors as it desired to have manufactured or repaired, and the necessary nails, lamp black, oil, and workmen's benches, together with a power saw and the power to operate it, "it being expressly understood and agreed, however, that said saw shall be used for no purpose other than for sawing lumber for temporary grain doors and temporary coal doors as herein provided." The railroad also agreed to switch cars "once" for the benefit of the Contractors; and to pay, for the work done by the Contractors, the unit prices specified in the contract. The term of the contract was one year, but it contained a provision for termination at any time by either of the parties on thirty days' notice.

On September 2, 1942, the Commissioner of Internal Revenue called upon the railroad for detailed information "relating to the facts and circumstances surrounding the performance of services" by the McKays.[3] On September 29, 1942, the railroad furnished the information requested.[4]

By letter of October 15, 1942, the rail-

---

[3] The first two paragraphs of the letter read as follows:

"This office has under consideration at the present time the status, for Federal employment tax purposes, of Messrs. Arthur E. McKay and Elmer O. McKay, doing business as McKay Brothers, Cheyenne, Wyoming, with respect to the services which they perform in connection with the manufacture and repair of temporary grain and coal doors for the Union Pacific Railroad Company.

"The question for determination is whether McKay Brothers is the employer of the individuals performing the above services or whether the Messrs. McKay and their assistants are all employees of the Union Pacific Railroad Company. Inasmuch as you are a party in interest whose tax liability may be affected by the conclusion reached in this case, it is deemed advisable to afford you an opportunity to submit information relating to the facts and circumstances surrounding the performance of services by the above individuals. Accordingly it is re-

quested that you furnish this office with the following information: * * *"

[4] "Union Pacific Railroad Company
"Omaha, Nebraska
"September 29, 1942
"No. A 342–J
"Commissioner of Internal Revenue,
"Treasury Department,
"Washington, D. C.
"Dear Sir:
"Referring to Mr. Geo. J. Schoememan's letter of September 2, 1942, File A&C:RR:1–GS, regarding the status of McKay Brothers for Federal Employment Tax purposes:
"I show below answers to the questions raised by Mr. Schoeneman:
"1. Photostat copy of contract of April 24, 1942 between Union Pacific Railroad Co. and Arthur E. McKay and Elmer O. McKay is attached.
"2. There have been no deviations from the provisions of the contract with respect to the performance of the services.
"3. The work of repairing and manu-

road was notified by a Deputy Commissioner of Internal Revenue that it was the opinion of the office of the Commissioner "that the Messrs. McKay and the individuals engaged by them, as well as any assistants engaged by such individuals, are employees of the Union Pacific Railroad Company for purposes of the taxes imposed under the Carriers Taxing Act for 1937 and Subchapter B of Chapter 9 of the Internal Revenue Code [26 U.S.C.A. Int.Rev.Code, § 1500 et seq.] with respect to all services performed

---

facturing grain doors and coal doors is conducted on the railroad right of way along side of the track. When not in use tools used in the work are housed in a Railroad Company building.

"4. The Railroad Company pays the water, light and fuel bills incurred in connection with the operation of the above business premises.

"5. The Railroad Company furnishes the necessary materials and supplies (such as nails, lumber, work benches, etc.) used in the manufacture and repair of the doors.

"6. The Railroad Company furnishes a power saw and conveyor used in the work. All other tools are furnished by McKay Brothers.

"7. So far as is known McKay Brothers do not perform services for other railroad companies.

"8. The Railroad Company does not have the right to determine—

"(a) The hours the business premises will remain open.

"(b) The rate of compensation to be paid to the assistants engaged by McKay Brothers.

"(c) The number of such assistants.

"In this connection it should be noted that the Railroad Company merely places order for specific work to be performed within a specified time and it is entirely within McKay Brothers' province to decide how many workmen shall be employed and the hours which they are to work to accomplish the required result.

"9. McKay Brothers are free to hire and discharge their assistants without consulting the Railroad Company.

"10. (a) McKay Brothers and their assistants are not carried on the pay roll of the Railroad Company.

"(b) The Railroad Company pays bills rendered by McKay Brothers in accordance with unit prices set forth in the contracts, within twenty days after the date of such bills. Bills are, of course, subject to verification as to the work performed.

"11. Instructions are given to McKay Brothers with respect to the construction of temporary grain and coal doors in the form of blue prints, and also with respect to the number of doors to be manufactured. No other instructions are given to them but they are expected to take the necessary safety precautions against possible accident and damage to Railroad Company property.

"12. The hours of service required of McKay Brothers' employes is decided entirely by McKay Brothers and the Railroad Company does not attempt to fix either the number of hours to be worked or the time of day during which the work is to be performed.

"13. McKay Brothers and their assistants are not eligible for benefits under the Railroad Company's pension plan. They are not listed on any seniority roster of the Railroad Company and are not working under any collective bargaining agreement. They are not allowed free transportation or given other rights and privileges enjoyed by Railroad Company employes, and they are not reported to the Interstate Commerce Commission as employes or in any other capacity.

"In connection with this matter it should be noted that one of the McKay Brothers' employes, Merle M. Smith, filed with the Nebraska Compensation Court at Lincoln, Nebraska, August 18, 1942, a workmen's compensation case against McKay Brothers and Union Pacific Railroad Co. alleging injuries received at Sidney, Nebraska, June 17, 1942. The Union Pacific was joined in the proceeding presumably because the Nebraska Workmen's Compensation Law imposes a liability upon anyone who employs a contractor and fails to compel the contractor to take out workmen's compensation insurance on the contractor's employes. The Union Pacific filed an answer claiming that by virtue of Sec. 48-106 Compiled Statutes of Nebraska for 1929 railroads engaged in interstate commerce are wholly exempt from the provisions of the Nebraska Workmen's Compensation Law. August 31, 1942 McKay Brothers, with their own funds, settled the claim with Smith for $50.00 and the proceeding was dismissed.

"It is the position of the Company that McKay Brothers are independent contractors as they do the work according to their own methods, and are not subject to the control of the Railroad Company as to the means and method of accomplishing the result.

"Yours truly,

"R. Wipprecht."

in connection with the manufacture, repair, and storage of the temporary grain and coal doors for the Company"; and that "Accordingly, tax liability is incurred by the Company under the above provisions of law with respect to the compensation received by the individuals in question for such services." [5] On the basis of this ruling, the McKays applied for and received a refund of taxes which had been paid by them under the Social Security Act, 42 U.S.C.A. § 301 et seq., which refund they paid over to the railroad.

On August 24, 1944, the Collector of Internal Revenue at Omaha was notified by a Deputy Commissioner of Internal Revenue that the McKays and the persons engaged by them were employees of the railroad "within the meaning of section 1621 of the Internal Revenue Code [26 U.S.C.A. Int.Rev.Code, § 1621]," and that the railroad was required to withhold in-

---

[5] The full text of the letter of the Deputy Commissioner of Internal Revenue is as follows:

"Treasury Department
"Washington
"A&C:RR:1-GS
"Oct. 15, 1942.
"Union Pacific Railroad Company,
"Omaha, Nebraska
"Attention:
Mr. R. Wipprecht
"File No. A 342-J
"Sirs:

"Reference is made to your letter dated September 29, 1942, transmitting information relating to the status, for Federal employment tax purposes of Messrs. Arthur E. McKay and Elmer O. McKay, doing business as McKay Brothers, Cheyenne, Wyoming, with respect to the services which they perform in connection with the manufacture, repair, and storage of temporary grain and coal doors for the Union Pacific Railroad Company.

"The information submitted discloses that the Messrs. McKay, pursuant to a written contract dated April 24, 1942, (a photostatic copy of which was transmitted,) agree to manufacture, repair, and store all temporary grain and coal doors which the Company may desire to have manufactured, repaired, and stored and to saw into proper lengths and widths and pile after sawing all lumber required in connection with such operations for the Company at Cheyenne, Wyoming, or Sidney, Nebraska, as the case may be. The Company furnishes and delivers to the Messrs. McKay railroad cars at or in the vicinity of the site upon which the said work is performed, all temporary doors which the Company desires to have stored, and all lumber necessary for the manufacture or repair of the temporary doors which the Company desires to have manufactured or repaired. The Company also furnishes all nails, lamp black, oil and workmen's benches, as well as a power saw and such power as is nec-

essary to operate the same. The Messrs. McKay are not allowed to use the power saw for any purpose other than the sawing of lumber for the temporary grain and coal doors.

"The Messrs. McKay are required to manufacture and repair temporary grain and coal doors in such quantities and at such times as desired by the Company and must make good at their own expense any and all defects in such doors resulting from poor workmanship. They employ approximately fifteen individuals and are required to increase or decrease their force at any time upon orders from the Company. The Messrs. McKay are compensated for their services in accordance with fixed schedules set forth in the above contract. The work of repairing and manufacturing the doors is conducted on the railroad right of way alongside of the track. When not in use, the tools, which are furnished by the Messrs. McKay and their assistants, are stored in a building belonging to the Company. The Messrs. McKay determine the hours the business premises will remain open and the rate of compensation to be paid to their assistants.

"Upon the basis of the information submitted, it is the opinion of this office that the Messrs. McKay and the individuals engaged by them, as well as any assistants engaged by such individuals, are employees of the Union Pacific Railroad Company for purposes of the taxes imposed under the Carriers Taxing Act for 1937 and Subchapter B of Chapter 9 of the Internal Revenue Code with respect to all services performed in connection with the manufacture, repair, and storage of the temporary grain and coal doors for the Company. Accordingly, tax liability is incurred by the Company under the above provisions of law with respect to the compensation received by the individuals in question for such services.
"Respectfully,
"George Schoeneman."

come tax from the compensation paid to the McKays and to the persons engaged by them.[6]

The only office the McKays have is in the small structure in the grain door yard. The only business they have is managing the yard for the railroad. They are not required by the railroad to be at the yard "any percentage of the time." So long as the work is done properly, the railroad has no complaint. The McKays do not devote their entire time to the work in the yard. They own jointly a 3500-acre ranch in Colorado, and Arthur E. McKay has an interest in 640 acres of grazing land in Nebraska. These lands are leased, but their supervision requires considerable time. The McKays and the members of the crews which they engage have not received passes from the railroad, and in many respects have not been accorded the status of conventional railroad employees.

This presents a fairly complete factual picture of the situation with which the District Court was confronted in this case. Unless this Court can demonstrate that the determination of the District Court that the McKays and the employees engaged by them are employees of the railroad is inconsistent with or unsupported by the evidentiary facts or is induced by an erroneous view of the law, the judgment should be affirmed.

The applicable law can, we think, be deduced from the opinions of the Supreme Court in the following cases: National Labor Relations Board v. Atkins & Co., 331 U.S. 398, 67 S.Ct. 1265; decided May 19, 1947; National Labor Relations Board v. Jones & Laughlin Steel Corp., 331 U.S. 416, 67 S.Ct. 1274; decided May 19, 1947; United States v. Silk, 67 S.Ct. 1463, decided June 16, 1947; Rutherford Food Cor. v. McComb, 67 S.Ct. 1473, decided June 16, 1947; Bartels v. Birmingham, 67 S.Ct. 1547, decided June 23, 1947.

While we realize that a case such as this must rest upon its own peculiar facts, we think that the case of Rutherford Food Corp. v. McComb, supra, is fairly analogous. In that case, the Administrator of the Wage and Hour Division contended that

---

[6] The letter of the Deputy Commissioner of Internal Revenue reads as follows:

"August 24, 1944

"Collector of Internal Revenue
IT:P:T:2
PAM-2

"Omaha, Nebraska (2)
"Attention: WT:AEY/mf

"Reference is made to your letter dated August 3, 1944, in which you request a ruling concerning the status for withholding tax purposes of Messrs. Arthur E. McKay and Elmer O. McKay and their employees.

"It is stated that the contract between the Messrs. Arthur E. McKay and Elmer O. McKay and the Union Pacific Railroad Company provides that the Messrs. McKay manufacture, repair, and store all temporary grain and coal doors in such quantities and at such times, as desired by the company, which supplies all material and equipment. The work is conducted on the railroad right of way alongside the track. The Messrs. McKay employ approximately fifteen individuals and are required to increase or decrease their force at any time upon orders from the company.

"The McKay Brothers and their employees were held in 1942 to be employees of the Union Pacific Railroad for employ-ment tax purposes and, in accordance with the ruling, the railroad company has been reporting the wages of these men and paying the employment tax on such wages. However, with respect to the withholding of income tax, it is stated that the McKay Brothers have been withholding a tax from the wages of the men, engaged by them, excluding their own remuneration and filing as a partnership. The question presented is whether the Union Pacific Railroad Company should include in its withholding tax returns the amount withheld from the employees of the McKay Brothers or whether the McKay Brothers should continue to file, reporting only the wages of their men excluding their own salaries.

"In view of the facts stated above, it is held that the Messrs. Arthur E. McKay and Elmer O. McKay and the persons engaged by them are employees of the Union Pacific Railroad Company within the meaning of section 1621 of the Internal Revenue Code. It is held, therefore, that the Union Pacific Railroad Company is required to withhold income tax from the compensation paid to Messrs. McKay and the individuals engaged by them, as well as any assistants engaged by such individuals.

"Norman D. Cann,
"Deputy Commissioner."

workers boning beef, under contract, for a packing company in Kansas were in reality employees of the company and not independent contractors. The District Court held them to be independent contractors. The Circuit Court of Appeals for the Tenth Circuit reversed. The Supreme Court affirmed the Circuit Court of Appeals in a unanimous opinion.

The facts of the Rutherford case are stated by the Supreme Court as follows, 67 S.Ct. at pages 1474, 1475:

"* * * During 1942, in order to be able to furnish beef boned to Army specifications to the Army under contract, Kaiser [the packing company] entered into a written contract with one Reed, an experienced boner, which provided that Reed should assemble a group of skilled boners to do the boning at the slaughterhouse. The terms of the contract were that Reed should be paid for the work of boning an amount per hundredweight of boned beef, that he would have complete control over the other boners, who would be his employees, that Kaiser would furnish a room in its plant for the work, known as the boning vestibule, into which the carcasses of cattle slaughtered by Kaiser would be moved on overhead rails by Kaiser employees, that Kaiser would also furnish barrels for the boned meat which would be washed and moved out of the vestibule by Kaiser's employees. Reed abandoned the work in February, 1943, and the work was taken over under an oral contract by one of the boners who had worked with him. This boner, Schindel, also abandoned the work in May, 1944, and an oral contract was then made by the company with Hooper and Deere, who had worked with Schindel. After a few months Deere left, at which time Hooper entered into a written contract substantially like the one between Kaiser and Reed, save that it provided for rent to be paid by Hooper for the boning room, although as a matter of fact no rent was ever paid. The District Court found that since the boning work had started in 1942, the money paid by Kaiser had been shared equally among all the boners, except for a short time after Hooper took over the work when he paid some of the boners by the hour. It was stipulated further that the boners owned their own tools, although these consisted merely of a hook to hold the meat, a knife to cut it, a sharpener for the knife, and a leather belt (apron). Although the C.I.O. union which was the representative of the workers of the company insisted that the boners be members, and although the written contracts provided that they should join, it was stipulated that the union dues of the boners were not checked off and that the boners were not subject to the authority of the union steward at the plant.

"The slaughterhouse operations, of which the boning is a part, are carried on in a series of interdependent steps. The cattle are slaughtered, skinned and dressed in the killing room, and the carcasses are moved thence on overhead rails into an overnight cooler by employees of Kaiser. The next day they are moved into another cooler and then into the boning vestibule, on the same overhead rail. They move around the boning room on the rail, each boner cutting off a section for boning. The boneless meat is put into barrels, or passed to a trimmer, an employee of Kaiser, who trims waste matter from the boned meat. Waste is put into other barrels. The barrels are moved from the boning room by employees of Kaiser into another room called the dock, where the meat is weighed and put on trucks. Kaiser has never attempted to control the hours of the boners, but they must 'keep the work current and the hours they work depend in large measure upon the number of cattle slaughtered.' 10 Cir., 156 F.2d 513, 515. It is undisputed that the president and manager of Kaiser goes through the boning vestibule many times a day and 'is after the boners frequently about their failure to cut all of the meat off the bones.' "

In its opinion, the Supreme Court said, 67 S.Ct. at page 1475, 1477:

"As in the National Labor Relations Act and the Social Security Act, there is in the Fair Labor Standards Act no definition that solves problems as to the limits of the employer-employee relationship under the Act. * * * The definition of 'employ' is broad. It evidently derives from the child labor statutes and it should be

noted that this definition applies to the child labor provisions of this Act, § 12. We have decided that it is not so broad as to include those 'who, without any express or implied compensation agreement, might work for their own advantage on the premises of another.' Walling v. Portland Terminal Co., 330 U.S. 148, 152, 67 S.Ct. 639, 641. In the same opinion, however, we pointed out that 'This Act contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.' 330 U.S. 150, 67 S.Ct. 640. We have said that the Act included those who are compensated on a piece rate basis. United State v. Rosenwasser, 323 U.S. 360, 65 S.Ct. 295, 89 L.Ed. 301. We have accepted a stipulation that station 'red-caps' were railroad employees. Williams v. Jacksonville Terminal Co., 315 U.S. 386, 391, 62 S.Ct. 659, 663, 86 L.Ed. 914. There may be independent contractors who take part in production or distribution who would alone be responsible for the wages and hours of their own employees. See United States v. Silk, supra [67 S.Ct. 1463]; compare Roland Electrical Co. v. Walling; 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383; Martino v. Michigan Window Cleaning Co., 327 U.S. 173, 66 S.Ct. 379, 90 L.Ed. 603. We conclude, however, that these meat boners are not independent contractors. We agree with the Circuit Court of Appeals, quoted above, in its characterization of their work as a part of the integrated unit of production under such circumstances that the workers performing the task were employees of the establishment. Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act.

"The District Court was of the view that:

" 'The right to contract is not only an inherent right but a constitutional right, and independent contracts, as a method of quantity production of boned beef, have not been uncommon in the packing business, generally. * * * The plan under which boners share equally in the boning money is commonly employed in Kansas City and elsewhere, and most of the boners who have worked in the Kaiser plant have worked at various times and in various plants under independent contractors. There is nothing inequitable in the sharing method under which compensation is divided equally among the group. It gives each man an interest in the amount of work being done by the other members of the group. It also gives no advantage to the man who is boning the fleshier parts of the carcass. Under this plan beginners and casual boners can be equitably taken care of by payment on an hourly basis out of the boning money.'

"We think, however, that the determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity. Viewed in this way, the workers did a specialty job on the production line. The responsibility under the boning contracts without material changes passed from one boner to another. The premises and equipment of Kaiser were used for the work. The group had no business organization that could or did shift as a unit from one slaughterhouse to another. The managing official of the plant kept close touch on the operation. While profits to the boners depended upon the efficiency of their work, it was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor. Upon the whole, we must conclude that these meat boners were employees of the slaughtering plant under the Fair Labor Standards Act."

Under the arrangement between the railroad and the McKays in the instant case, the McKays and the employees in suit are, from a practical standpoint, completely dependent upon the railroad for both work and pay. The railroad has never obligated itself to furnish work. It has merely obligated itself to pay for work performed. The railroad is free to withdraw from the arrangement at any time, and so are the McKays. See and compare E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 228-232, 89 A.L.R. 238, and cases cited. The work done in the yard is essential to the operation of the rail-

road as an interstate carrier. Compare Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 556, 557, 57 S.Ct. 592, 81 L.Ed. 789. The work is done in conformity with the railroad's directions and specifications, on the railroad's property, and with the railroad's materials and equipment. The McKays' investment in the work is negligible, consisting of the $500 tractor purchased for their convenience in moving freight cars. The contribution of the McKays is the management necessary to operate the yard. The arrangement they have for their compensation contains some possibility of gain or loss to them. Obviously, however, unless the railroad fixes unit prices sufficient to cover production costs and some compensation for the McKays, the work under the present arrangement will cease.

The fact that in the contract of April 24, 1942, the railroad endeavored to make the McKays independent contractors, and the men engaged by them employees of the McKays, is not controlling. Bartels v. Birmingham, 67 S.Ct. 1547, 1550. The construction placed by the railroad upon the contract, which would have made the McKays independent contractors, was rejected by the Commissioner of Internal Revenue in 1942 and again in 1944. The railroad acquiesced in his rulings. The relationship of the McKays to the railroad and its relation to their crew have not all the attributes of the conventional employer-employee relationship. On the other hand, the arrangement of the McKays with the railroad lacks many of the earmarks of an independent contract, especially permanency and mutuality of obligation. The railroad, having accepted the status of an employer of the McKays and the employees in suit, was thereafter in no position to escape liability for the wages of such employees.

We are aware that "the terms 'employee' and 'employer' in" the "statute carry with them more than the technical and traditional common law definitions," and that "They also draw substance from the policy and purposes of the Act, the circumstances and background of particular employment relationships, and all the hard facts of indus-

trial life." National Labor Relations Board v. Atkins & Co., 331 U.S. 398, 403, 67 S.Ct. 1265, 1268. "Probably it is quite impossible to extract from the statute a rule of thumb to define the limits of the employer-employee relationship. * * * the courts will find that degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete." United States v. Silk, 67 S.Ct. 1463, 1469.

A strong argument has been made that the McKays, in a broad sense, are independent contractors and must be regarded as the employers of the men whom they hire, supervise, pay, and discharge. We go no further than to say that we are unable to demonstrate to our own satisfaction that the determination of the District Court that the McKays are not employers, but are themselves employees of the railroad, is clearly wrong. We think that the District Court has reached a permissible conclusion

The appellant contends, however, that, even if the McKays and the employees in suit are employees of the railroad, § 13(b) (2) of the Fair Labor Standards Act does not deprive the employees of the benefits of § 7 of the Act, since the McKays act for the railroad in engaging the employees and are not themselves "subject to the provisions of Part I of the Interstate Commerce Act," and since the making of grain and coal doors is outside of the railroad's transportation functions. It seems obvious to us that the making, repairing and storing of temporary grain doors and coal doors which are essential for the shipment of grain and coal are necessary parts of the business of the railroad. If the McKays represent the railroad in employing men and supervising the operations at the grain door yard, as the District Court determined, the men are not in any proper sense employees of the McKays, but are employees of the railroad and exempt from the provisions of § 7 of the Act. We think that the employees reasonably cannot be regarded as employees of the McKays for the purpose of § 7 of the Act and as em-

ployees of the railroad for other purposes. They are employees of the McKays or of the railroad, but not of both.

█ It may be, as the appellant contends, that the employees in suit should be granted the increased rates of pay for overtime work which are provided in § 7 of the Act, but that, we think, is a question for Congress and not one for the courts. Compare, Levinson v. Spector Motor Service, 330 U.S. 649, 661, 662, 67 S.Ct. 931.

The judgment appealed from is affirmed.