**REYNOLDS v. NORTHERN PAC. RY. CO.**
**REYNOLDS et al. v. SAME.**
**Nos. 13583, 13586.**

Circuit Court of Appeals, Eighth Circuit.
May 14, 1948.

Abbott M. Sellers, Sp. Asst. to the Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., Helen R. Carloss, Lee A. Jackson and Maurice P. Wolk, Sp. Assts. to the Atty. Gen., Victor E. Anderson, U. S. Atty. and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., on the brief), for appellant.

Richard R. Lyman, of Toledo, Ohio (Thomas Vennum, of Minneapolis, Minn., Willard H. McEwen, of Toledo, Ohio, Vennum, Neville, Wright & Newhall, of Minneapolis, Minn, and Mulholland, Robie & McEwen, of Toledo, Ohio, on the brief), for intervening appellants, Railway Employes' Department of the American Federation of Labor and others.

M. L. Countryman, Jr., of St. Paul, Minn., (L. B. daPonte, of St. Paul, Minn., on the brief), for appellee.

Before SANBORN, JOHNSEN and RIDDICK, Circuit Judges.

JOHNSEN, Circuit Judge.

The Commissioner of Internal Revenue in 1944, for the first time, made assessment of employment taxes under the Carriers Taxing Act of 1937, §§ 1–13, 45 U.S.C.A. §§ 261–273, 26 U.S.C.A. Int.Rev.Code, § 1500 et seq., against Northern Pacific Railway Co. on workers who had been performing services under various contracts between Addison Miller Co. and the Railway Co. and on workers who had been performing services under contracts between A. W. Partridge Co. and the Railway Co. The assessments were for the years 1939 to 1943 inclusive. The Railway Co. paid the assessments under protest, filed timely

claims for refund, which were denied, and then instituted action against the Collector of Internal Revenue for the District of Minnesota to recover the payments. The District Court, on a trial without a jury, gave judgment in favor of the Railway Co. (Northern Pacific Ry. Co. v. Reynolds, D. C. Minn., 68 F.Supp. 492), and the Collector has appealed.[1]

All the workers involved had a direct employment relationship with the one or the other of the two contracting companies and were hired, fired, supervised and compensated by the company with which they had made the employment relationship. Each company had paid social security taxes on all the workers thus employed by it during the years involved, under 26 U.S.C.A. Int. Rev.Code, §§ 1400 and 1410.

The Miller Co. and the Partridge Co. were unrelated concerns, and neither of them was directly or indirectly owned or controlled by any railroad company. The former was successor to the enterprise initiated by Addison Miller individually some 30 years before and the latter to the enterprise initiated by A. W. Partridge individually even farther back than that. The Partridge Co. was engaged in the business only of furnishing boarding camp services to railroad companies and others under contracts, and its first contract with Northern Pacific for such services had been made in 1912. The Miller Co. was engaged in the business of furnishing not merely boarding camp services but also general services to railroads, and its first contract was made with Northern Pacific in 1914.

Contracts for such services by outside contractors were in effect on Northern Pacific at the time the railroads were taken over by the Government in World War I, and the Director General of Railroads made renewals of them during his operation of the road. In fact, Northern Pacific has at all times had some of such contracts outstanding on its system. Thus, one of the activities here involved, that of operating necessary boarding camps for its employees, has continuously been contracted out to commissary concerns, such as the Miller Co. and the Partridge Co. and others, and has never been directly engaged in by Northern Pacific throughout its history. There have also practically continuously been contracts covering other operations. Contracts with the Miller Co. and with the Partridge Co. of the types here involved were in effect on Northern Pacific at the time the Carriers Taxing Act was originally enacted. There is thus no basis in the situation for asserting, nor does the Collector make any such contention, that the contracts in question were schemes devised to escape carrier taxes.[2]

Again, the record hardly affords room to question that the activities of the Miller Co. and of the Partridge Co. both had the dignity and status of actual business enterprises. The operations and contract relationships of each company extended throughout the northwest and the middle west and they were not confined to any particular railroad. Both companies had business offices, business staffs, business organizations, business capital and business risks. The testi-

---

[1] The Commissioner made further assessments of such carrier taxes against the Railway Co. while the suit for refund was pending and these subsequent assessments were similarly paid and made the subject of another action against the Collector. The two actions were consolidated for trial purposes and are the subject of consolidated appeals. There is thus involved here the refund of such taxes for the years 1939 to 1945 inclusive.

Various labor unions, such as Railway Employes' Department of the American Federation of Labor and others, were permitted to intervene in the first action on the side of the Collector and have joined in the appeal here as intervenor-appellants.

[2] Long before the enactment of the Carriers Taxing Act, the Supreme Court had recognized the validity of a bona fide contract between a railroad company and an independent contractor, for unloading and handling of coal at a coal chute and other similar services, as against the provision of 45 U.S.C.A. § 55, of the Federal Employers' Liability Act, that "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by (the Federal Employers' Liability Act), shall to that extent be void." Chicago, R. I. & P. R. Co. v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735.

mony of one of the officers of the Partridge Co. showed that the company had a capitalization of around $50,000 and owned property used in its business which was carried on its books at a depreciated value of $36,000. The record also shows that the Miller Co. had an office or headquarters staff of 34 people, that its activities were such that it maintained a regular employment office set-up for its operations, and that it carried deposit balances in banks at St. Paul, Cleveland, Seattle and Portland ranging from $50,000 to $300,000 or $400,-000, as well as smaller balances at other points over the country where it was necessary to serve a payroll convenience.

Except during the period of the recent World War, when the uncertainties of costs made necessary a cost-plus relationship in virtually all contracting fields, the services involved were contracted to be furnished almost entirely on a unit price basis, such as a certain price per man per week or per meal for providing boarding camp meals, certain prices per ton for handling coal at coal chutes and for loading ore at ore docks and for icing refrigerator cars, a certain price per car for cleaning refuse out of stock cars, etc. The contracts generally contained a 30 day cancellation privilege in favor of each party, and modifications had been made at various times in the prices for which the contracts originally provided, but these modifications were not retroactive and in general the contractor assumed the risk of loss or profit on the prices at which the services were immediately being furnished under the contracts. The contracts also required the contractor to indemnify Northern Pacific for any injury to a railroad employee from the negligence of the contractor's workmen.

Beyond this, up to the time that the Commissioner took his present taxing position in 1943 and 1944, all governmental agencies and departments (including the Commissioner) with a responsibility as to the relationship involved, as well as all the parties personally affected by the question (the workers themselves, the Miller Co., the Partridge Co., and the Railway Co.) seem to have regarded and treated the Miller Co. and the Partridge Co. as being engaged in a separate enterprise and the persons performing the services for them generally under such contracts as being employees of that enterprise for purposes of all applicable federal statutes.

Thus, it is stipulated in the record that, from the time the Social Security Act, 42 U.S.C.A. § 401 et seq., was enacted (from whose coverage employees of carriers by railroad are expressly excluded by 42 U.S.C.A. § 409(b) (9)), the Commissioner had assessed and collected from the Miller Co. and the Partridge Co. on the workers involved employment taxes under 26 U.S.C.A. Int.Rev.Code, §§ 1400 and 1410, such assessments being entitled to be made only, of course, on the basis that the workers were within the coverage of the Social Security Act. The Commissioner in fact has continued to make such assessments and collections against the Miller Co. and the Partridge Co. down to the present time, despite his conflicting insistence in the assessments made in 1944 and since that the Railway Co. is obligated to pay carrier taxes upon such workers and so bring them under the provisions of the Railroad Retirement Act of 1937, 45 U.S.C.A. § 228a et seq.

Then, too, the Administrator of the Wage and Hour Division has at all times insisted that all such workers are subject to the overtime provisions, 29 U.S.C.A. § 207, of the Fair Labor Standards Act of 1938, from the coverage of which they further are excluded, under 29 U.S.C.A. § 213(b) (2), if they are employees of Northern Pacific. In fact, as far back as 1941, the Administrator had brought suit against the partner members of the Miller Co. to compel adherence in that company's operations to the Fair Labor Standards Act and secured the entry of a consent decree of injunction and for payment of previous overtime compensation under the Act to the workers under all its railroad contracts including those that are here involved. Litigation thereafter arose over a portion of the decree and, at the very time that the Commissioner was commencing to insist to Northern Pacific as well as to other railroads that they were liable retroactively for carrier taxes on the workers under their contracts with Miller Co., the Administrator was in this Court successfully vindicating

938

the rights of those workers under the decree to overtime conpensation on the basis of their coverage under the Fair Labor Standards Act as employees of the Miller Co.[3] See Walling v. Miller, 8 Cir., 138 F. 2d 629.

Further than this, the Administrator and the Commissioner apparently still are in disagreement over the Commissioner's present position, for, while this appeal of the Collector has been pending, the Administrator has sought before us in another case to overthrow the effect of the Commissioner's similar position as here. McComb v. McKay, 8 Cir., 164 F.2d 40. That case involved a situation where a different railroad and a different contractor, in order to dispose of the administrative confusion and tax difficulties, had agreed to recognize the workers under the contract existing between them as employees of the railroad.[4]

Again, as we have previously indicated, all the parties personally involved in the relationship here (the workers, the Miller Co., the Partridge Co., and the Railway Co.) have hitherto by their actions construed the situation as being one in which the Miller Co. or the Partridge Co. and not the Railway Co., was the employer of the workers and in which the legal burdens attending that status would fall on the shoulders of such company.

Besides the acceptance and retention by such workers of the difference between the lesser deduction required to be made from their wages under 26 U.S.C.A. Int.Rev. Code § 1400, of the Federal Insurance Contributions Act, as non-carrier employees, than that for which provision is made under 26 U.S.C.A. Int.Rev.Code § 1500, 45 U.S.C.A. § 262, of the Carriers Taxing Act, as carrier employees, the workers have had the benefit, through the period involved, of state workmen's compensation acts, under compensation insurance required by state laws to be carried by such companies as the employers of the workers, or under contributions required to be made by the companies as such employers to state

workmen's compensation funds. And the record shows that the workers have availed themselves of this status and have collected disability payments under it on the basis of being employees of the contracting company. Similarly, it appears that they also have had the right to avail themselves of state unemployment benefits by virtue of their status as employees of such company and the contributions made by such company to state unemployment insurance funds.

And, as already mentioned, by court decree the workers under the Miller Co. contracts have collected overtime compensation under the Fair Labor Standards Act as employees of that company. In fact, the workers generally for such contracting companies furnishing services to railroad companies seem similarly to have regarded themselves as employees of the contracting company in their claims of rights. Thus, for example, even the Supreme Court has been called on to settle the question of Fair Labor Standards Act rights, asserted by a cook employed by such a contractor in furnishing boarding camp services to a railroad in a contractual relationship like that here involved. See McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538. Again, the record before us shows that the workers of the Miller Co., in most of the fields covered by the contracts with Northern Pacific, have carried on collective bargaining with the Miller Co. as their employer, through unions of which they were members, and the unions have made agreements with the Miller Co. as to the working conditions of such workers.

■■ It will have been apparent from what has been said that the question here is not the usual one of whether the workers involved will be left excluded from some general field of social legislation, for they are admittedly within the operation of either the Social Security Act or the Railroad Retirement Act, both of which have the same social purpose in their respective fields of coverage and only one of which

---

[3] Somewhat ironic—Northern Pacific was also assessed carrier taxes on the overtime compensation paid by the Miller Co. under the decree as a Fair Labor Standards Act obligation.

[4] Down to the present time, part of the Government's legal staff has thus been striving in the courts to establish one judicial viewpoint and part of it a contrary one.

can be applicable to the work that is under consideration. Nor is the problem one of weighing the comparative advantages to the workers under the one or the other. (That question incidentally would involve a close teetering of the scale pans, from the auxiliary weight on the one side of the Fair Labor Standards Act.) And the situation is not one where a viewpoint could in any way be influenced by a difference in the realization of governmental revenue, for neither the Carriers Taxing Act nor the Federal Insurance Contributions Act can be regarded as simply a common revenue measure, but each is intended to make available funds for paying retirement benefits under the social security scheme to which it is related. Cf. State of California v. Anglim, 9 Cir., 129 F.2d 455, 458. In fact, Congress has recently given the taxing provisions here involved the popular title of "Railroad Retirement Tax Act." 60 Stat. 725, 26 U.S.C.A. Int.Rev.Code, § 1538.

The Commissioner as a statutory foundation has purported to rest his assessments against Northern Pacific on the definition in 26 U.S.C.A. Int.Rev.Code, § 1532(d), 45 U.S.C.A. § 261(d), as then existing, that "An individual is in the service of an employer (carrier) whether his service is rendered within or without the United States *if he is subject to the continuing authority of the employer to supervise and direct the manner of rendition of his service,* which service he renders for compensation * * *." (Emphasis added.) But the history of the situation, the general scope of the Commissioner's action, and the perspective which the evidence presents impel the conclusion that the guiding consideration in the action was not an examination of individual job relationships but a classification of the work generally on the basis of functional aspect in railroad operation plus the factor of whether it was performed on railroad property.

The net result of what the Commissioner did was to classify as employees of Northern Pacific all workers of the two contracting companies who performed services of a type that might be said to have been integrated into Northern Pacific operations and which were rendered wholly on Northern Pacific property. Thus, carrier taxes were assessed as to all workers unloading or loading ore at the ore dock at Superior, Wisconsin; all workers unloading or handling coal at any coal dock or coal chute; all workers heating or handling sand for locomotives; all workers icing refrigerator or other cars; all workers cleaning the refuse out of stock cars or cleaning cinder pits; all workers engaged in watching or keeping tied-up engines ready; and all workers in the various boarding camps over the system. The only contract operations as to which the Commissioner did not assess carrier taxes were those of harvesting ice and packing it in Northern Pacific ice houses (only part of which work was performed on property used by Northern Pacific in its operations) and those of manufacturing ice at two points in the State of Washington for Northern Pacific's use and putting the ice in Northern Pacific cars (the ice plants not being owned by Northern Pacific but by the contractor.)

In this connection, we think it is of indicative significance to note the amendment which Congress made in 1946 to 26 U.S.C.A. Int.Rev.Code, § 1532(d). By Public Law 572, § 1, 79th Cong., 2nd Sess., 60 Stat. 722, the definition of "service" applicable in the taxing of carrier employment was enlarged to read as follows: "An individual is in the service of an employer whether his service is rendered within or without the United States if (i) he is subject to the continuing authority of the employer to supervise and direct the manner of rendition of his service, or he is rendering professional or technical services and is integrated into the staff of the employer, *or he is rendering, on the property used in the employer's operations, other personal services the rendition of which is integrated into the employer's operations,* and (ii) he renders such service for compensation." (Emphasis added.) This change in definition was one approved by both the Internal Revenue Department and the Railroad Retirement Board.

On all the considerations involved, it seems to us rather clear that the language which we have emphasized above in the enlarged congressional definition was intended to bring the statute into harmony with the position which the Commissioner was

assuming to take (contrary to his previous tax-assessment actions) on the contracts here involved and the similar contracts existing in the railroad world. Congress did not, however, make the amendment as a clarification of its previous definition, but only as an extension of the scope of the Act for future application. It refused to allow the amended definition to have any previous significance, for it specifically provided that the definition "shall be effective only with respect to services rendered after December 31, 1946." 60 Stat. 741, § 402, 26 U.S.C.A. Int.Rev.Code, § 1532 note. It did not therefore purport to lend sanction to any previous action of the Commissioner which was based upon the factor of the contract services having been performed on railroad property and having been integrated into the railroad's operations.

While, as we have said, the Commissioner purported formally to rest his action in making the retroactive assessments on the language in the previous definition, "subject to the continuing authority of the employer to supervise and direct the manner of rendition of his service", we are convinced from the general situation and the facts in the record that this realistically was not an objective standard in the wholesale action taken but rather a subjective front. There cannot be said to have been a factual examination and evaluation of the details of performance in each of the various fields of work. While there was some testimony by a few individual workers, such as some single coal chute worker or an engine watcher at an outlying point, that some particular roundhouse foreman or superintendent had presumed at times to try to boss him in his work, this evidence was not such as to present a factual picture controlling the relations of the whole field or any general class in it. And it is the whole or class action of the Commissioner that is here being tested and not the question of whether some specific worker in some special situation had been sufficiently bossed, supervised or directed so that he might individually claim the right to be regarded as a railroad employee. Only by adopting the premise that the functional aspect and integral relationship of the services to railroad operations were

such that the railroad could not possibly have surrendered vital control and direction would it be at all possible to conclude on the record before us that the workers were subject to the continuing authority of the employer to supervise and direct, in a manner and to the extent necessary to regard them as railroad employees under the statute. But that broad and abstract premise is not warranted by the history of the contracting enterprises, the long-recognized economic relationships involved, and the language of the statute in the light of the 1946 amendment and its purpose.

And the contracts do not contain any provision determinative of a right of control generally in the Railway Co., for whatever significance such a provision might have had in the situation. In the case of the engine-watching contracts, because of the special hazards involved, it is true that there was a protective provision that the work should be performed "in a manner satisfactory to and in compliance with the instructions and rules of the Superintendent of the Railway Company." The boarding camp contracts contained a provision that "Complaints as to food, service, or charges, shall be adjusted by the contractor to the satisfaction of the officers of the Railway Company, whose judgment in the matter shall be final and conclusive." Some of the contracts contained a provision that the contractor at the end of the first year should have the option to continue it in effect for a second year, "if the work during that period shall have been performed to the satisfaction of the Railway Company." Incidental provisions of no greater import were contained in some of the other contracts also.

■ Beyond what we have discussed above, there is no basis to hold that either of the contracting companies had so surrendered its right of control or had so failed to exercise it in fact as to have lost in effect its identity or status as a separate business enterprise in furnishing the services involved, or to have caused the relationship of the workers to that enterprise to have been economically dissolved, within the language and spirit of the Carriers Taxing Act as then existing. The enterprise status and employment relationship

which have soundly existed and been so long recognized may not loosely be brushed aside by administrative action, in order retroactively to switch social security coverage from one accepted statutory scheme to another. And, as we have suggested, in viewing the reality of the status and relationship, the previous recognition of it by all governmental agencies and departments (including the Commissioner) having a statutory responsibility and by all the parties personally affected by the question cannot be ignored. Further, the question necessarily must be viewed in the light of United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757; Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947, 172 A.L.R. 317, and the other recent expressions of the Supreme Court dealing with the sound determination of enterprise status and employer-employee relationship.

The importance also in the present situation of giving heed to congressional intent in the history of railroad legislation may again be emphasized. From the beginning of the recent social legislation for railroad employees, Congress was cognizant of the long-established practice obtaining in the railroad world of contracting for the furnishing by outside contractors of services such as those here involved, and it chose not to include such contract workers generally or as a class in the scope of this railroad legislation. Thus, when it was proposed in 1934 to bring all the contracting companies performing services which were an integral part in railroad transportation within the definition of a "carrier" in the Railway Labor Act, 45 U.S.C.A. § 151 et seq., (the Carriers Taxing Act having taken its definition of a carrier from the Railway Labor Act), Congress would not accept the proposal. See S. 3266, as originally introduced in 73rd Cong., 2nd Sess. Congress would only agree to include such contracting companies within the definition as were "directly or indirectly owned or controlled by one or more such (railroad) carriers or under common control therewith * * *." Again, when the general proposal was renewed in the 79th Cong., 2nd Sess., to bring all such contractors directly under the Carriers Taxing Act, Congress a second time rejected it.

See Cong. Rec., 79th Cong., 2nd Sess., pp. 10,236, 10,293. It did see fit, for the first time, to allow to be classified generally as railroad employees every person "rendering, on property used in the employer's (carrier's) operations, * * * personal services the rendition of which is integrated into the employer's operations". It specifically provided, however, as we have previously pointed out, that this change "shall be effective only with respect to services rendered after December 31, 1946."

The Commissioner on this clear indication and expression of congressional intent would not of course be warranted in attempting to make such coverage applicable prior to January 1, 1947. Nor should he be permitted to do so by any metaphysical use of the previous coverage provision of "continuing authority of the employer to supervise and direct the manner of rendition of his service", through premising the question of authority to supervise and direct controllingly on the assumption or inference of sufficient supervision and direction absolutely and necessarily being involved from the functional aspect and relationship of the services to railroad operation.

Perhaps some incidental supervision and direction by the railroad inherently may be involved from the integration of the services into the railroad operation but, in the light of the history of congressional action and the significance which must be given to the 1946 amendment as a general coverage addition not previously contained in the statute, any such inherent incidental supervision and direction can not abstractly and absolutely be made to become the controlling ingredient of the "continuing authority of the employer to supervise and direct the manner of rendition of his service" implied by the previous definition of carrier service. To so hold would be to outwit Congress and to say that the 1946 amendment never really added anything to the statute or was capable of serving any new purpose.

■ With further burdensome repetition, we again remind of the long recognized status of the contracting companies as business enterprises and of the workers under the contracts as constituting em-

ployees of those enterprises. That recognition, in its application to the years involved in the Commissioner's retroactive action, has been substantive and the steps taken and their consequences are not now economically retraceable. In this situation, the Commissioner's attempt to retroactively overthrow the recognized status and accepted relationship, with their previous economic effects on all the parties involved in a manner that cannot be undone, cannot be viewed with judicial favor. Cf. United States v. Alabama G. S. R. Co., 142 U.S. 615, 621, 12 S.Ct. 306, 35 L.Ed. 1134. And this is the more so, in the light of the Administrator of the Wage and Hour Division's conflicting insistence on the previously recognized status and accepted relationship and his attempts to enforce them. We think that the statute sufficiently marks the pace which Congress intended should be set and that the Commissioner ought not artificially and doubtfully to be permitted to reach retroactively behind it.

■ On all of the considerations expressed, we hold that the record does not warrant the general assessments of carrier taxes made by the Commissioner on the contract workers for the years involved, as having been railroad employees within the language and intent of the statute as then existing, and that the Railway Co. was entitled to a refund of the taxes so assessed against it.

There is no conflict in these views with our decision in McComb v. McKay, 8 Cir., 164 F.2d 40, for in that case we simply upheld the right of the trial court to regard the relationship of the five to ten contract workers involved as sufficiently being carrier employees on the facts in the record and particularly in the light of the agreement between the railroad and the contractor to end the controversy with the Commissioner by having the railroad company recognize them as its employees and place them on its payroll.

Nor have we overlooked the decision in Wabash R. R. Co. v. Finnegan, D.C., E.D. Mo., 67 F.Supp. 94. Elements were there involved that are not here present, as the opinion indicates. In so far, however, as the decision purports to rest on the general ground that supervision and control necessarily and inherently were present because it would be impossible for a railroad company to surrender them with respect to any services integrated into its operations, we think the court there, like the Commissioner here, has indulged in an absolutism that from the standpoint of entrepreneurial status and recognized relationships, and in the light of statutory provision and congressional intent, is not thus broadly maintainable. Compare also Pennsylvania R. Co. v. United States, 108 Ct.Cl. 419, 70 F. Supp. 595.

It should be stated that the trial court in giving judgment for the Railway Co. in the present case appears to have predicated its decision primarily on the ground that Congress did not intend that employment taxes could be assessed against a railroad company under the Carriers Taxing Act except as to such persons as were on the railroad company's payroll and had a contract for hire with it. See 68 F.Supp. at pages 498, 499.

■ We agree with the Commissioner that this is too narrow an interpretation of the statute and that for purposes of the Carriers Taxing Act persons performing services clearly may be regarded as railroad employees, even though they are not directly employed or directly paid by the railroad company, if they otherwise meet the qualifications of the statute.

The Commissioner argues that the trial court should be required to make findings on the question of supervision and control. We have indicated that, on all the considerations involved, the record in our opinion would not permit of a holding that all of the workers generally or as classes were entitled to be regarded as employees of the Railway Co. prior to the 1946 amendment of the statute. This is sufficient to require affirmance of the judgment without regard to the basis on which the trial court's decision rested.

In what we have said, we are not to be understood as declaring or intending to imply that all of the contract services involved necessarily are within the operation of the 1946 amendment to 26 U.S.C.A. Int. Rev.Code, § 1532(d). It would seem rather clear that most of them are. But whether

services such as boarding camp operations constitute "personal services the rendition of which is integrated into the employer's operations" within the meaning of the 1946 amendment should in fairness perhaps be left open, and we therefore make no intimation on it.

Affirmed.