NICHOLAS, Collector of Internal Revenue, v. DENVER & R. G. W. R. CO.

No. 4363.

United States Court of Appeals
Tenth Circuit.

March 18, 1952.

Maurice P. Wolk, Sp. Asst. to Atty. Gen. (Charles S. Vigil, U. S. Atty., Henry E. Lutz, Asst. U. S. Atty., Denver, Colo., Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack and Robert N. Anderson, Sp. Assts. to Atty. Gen., on the brief), for appellant.

Theodore A. White, Denver, Colo. (Thomas R. Woodrow, Denver, Colo., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and MURRAH, Circuit Judges.

BRATTON, Circuit Judge.

Acting under the Carriers Taxing Act of 1937, 50 Stat. 435, 45 U.S.C.A. § 261 et seq., the Commissioner of Internal Revenue assessed against The Denver and Rio Grande Western Railroad Company employment taxes for the years 1942 to 1946, inclusive; and acting under the Railroad Retirement Tax Act, 60 Stat. 722, 45 U.S.C.A. § 228a, the Commissioner made a like assessment against the railroad company for the year 1947. The asserted tax was predicated upon the determination of the Commissioner that Glen R. Lamberg and others rendering service in connection with the operation of stockyards located on the line of railroad of the company at Alamosa, Grand Junction, Montrose, and Salida, were employees of the railroad company, within the intent and meaning of the acts to which reference has been made, and that the railroad company was liable for the tax based upon the compensation of such persons not in excess of $300 for any calendar month. The tax was paid under protest; claim for refund was seasonably filed and denied; this suit was instituted to recover the amount paid, with interest thereon; judgment was rendered for the railroad company; and the collector appealed. While the appeal was from the judgment in its entirety, the collector now challenges only that part of the judgment relating to the taxes assessed and paid for the year 1947.

The material facts were not in controversy. By agreement executed in 1932, the railroad company leased to Lamberg its stockyards at Alamosa, Grand Junction, and Salida; and by like agreement executed in 1934, it leased to him its stockyards at Montrose. The two contracts were identical except in respect to date and stockyards covered, and for convenience reference will be made to them in the singular. The stockyards were equipped with pens, alleys, loading chutes, platforms, watering facilities, electric lines, and certain buildings. Lamberg was obligated under the contract to unload, pen, feed, water, and reload livestock shipped by the railroad company. He maintained a general office at Salida and employed a chief clerk there. He employed three foremen, two assistant foremen, and two or three other men at each yard who were subject to call. The balance of the labor was seasonal, and sometimes he employed from fifty to sixty men. He hired the men, determined and paid their wages or compensation, and discharged them at will. The contract provided that in the event any agent or employee of Lamberg was objectionable to the railroad company, such individual should be relieved of further service upon request of the railroad company; but in only one instance was an employee discharged on that ground. Lamberg worked himself, acting as foreman at one yard and

giving general supervision to the other yards. With his own funds, he furnished for use in the operation of the business tractors, pick-up trucks, wagons, trailers, tools, and other equipment. He purchased hay and other feed, and bore expenses in connection with his operation of the business such as coal, light, telephone, office supplies, repair and upkeep of equipment, compensation and public liability premiums, social security premiums, and state tax. He constructed one or more buildings on the property and he paid ad valorem taxes on them. His capital investment at the outset was about $10,000; it was increased to approximately $20,000; and from time to time, he borrowed money from local banks with which to finance the business. Usually when the owner or a caretaker accompanied livestock being shipped over the railroad, he paid Lamberg for the feed and service rendered; but ordinarily, when livestock was not accompanied by its owner or a caretaker, Lamberg furnished the railroad company an invoice of the charge, the railroad company paid him, and it collected the amount from the owner at the destination of the shipment. At the stockyards in Alamosa, Montrose, and Salida, some shipments of livestock were transferred from narrow gauge to standard gauge cars, and some from standard gauge to narrow gauge, for which the railroad company paid a fixed charge; and Lamberg rendered other incidental service for which the railroad company paid him fixed sums. The contract provided that the charges made for feed furnished livestock being shipped should be governed and determined by the prices contemporaneously charged at similar stockyards on other competing railroads, and should be subject to the approval of the railroad company; and it further provided that to enable Lamberg and his agents to travel for the purpose of purchasing feed and for the purpose of visiting the stockyards in supervising the work, the railroad company should furnish them transportation without charge, such transportation to be limited in use to travel in connection with the duties and obligations assumed by Lamberg under the contract. Lamberg's business was not confined to handling livestock moving in transit.

Some livestock not being shipped by the railroad company was handled in the yards. Formerly stock being driven from range to range frequently was cared for in the yards; and later shipments moving by truck were stopped, cared for, and their movement resumed. In addition, Lamberg conducted a feeding operation of livestock for shippers and patrons; and he rendered other service in the nature of branding, disinfecting, or anything else incidental to the care and handling of livestock, whether local or transient or terminating in the yards. In obtaining and maintaining a supply of feed at the several stockyards, Lamberg sometimes made shipments of hay over the railroad of the company; and in such instances, he paid the regular freight charges. The railroad company did not exercise supervision or control of the manner in which the stockyards were operated. It frequently advised Lamberg when shipments were expected, and when trains were scheduled to depart; but otherwise, it did not exert any direction or control in respect to the conduct of the business.

■ Section 1(a) of the Carriers Taxing Act, so far as material here, defines the term "employer" to mean any carrier which operates any equipment or facility, or performs any service, in connection with the transportation of passengers or property by railroad; section 1(b), with certain specific inclusions and exclusions not having present material bearing, defines the term "employee" to mean any person in the service of one or more employers for compensation; and section 1(d) provides in substance that an individual is in the service of an employer if he is rendering service for compensation and is subject to the continuing authority of the employer to supervise and direct the manner of rendition of the service. It is clear that under well recognized principles of general law, Lamberg was an independent contractor. And it is equally clear that during the years 1942 to 1946, inclusive, such an independent contractor and his employees were not employees of a railroad company for purposes of employment tax under the Carriers Taxing Act. Reynolds v. Northern Pacific Railway Co., 8 Cir., 168 F.2d 934, certiorari

denied, Railway Employes' Department of American Federation of Labor v. Northern Pac. R. Co., 335 U.S. 828, 69 S.Ct. 55, 93 L.Ed. 382; Pennsylvania Railroad Co. v. United States, 70 F.Supp. 595, 108 Ct.Cl. 419.

■■ But in 1946, the Carriers Taxing Act was amended in certain respects by the Railroad Retirement Tax Act, supra, frequently referred to as the Crosser Act. As finally enacted into law, section 1 of the Act includes in the definition of the term "employee" one who is "rendering, on the property used in the employer's operations, other personal services the rendition of which is integrated into the employer's operations, and (ii) he renders such service for compensation, * * *." 45 U.S.C.A. § 228a. The language just quoted was new. No identical or similar language was contained in the Carriers Taxing Act, and it is relied upon primarily to bring within the scope of the statute Lamberg and others who rendered services in 1947 in connection with the operation of the stockyards. The new language may not be isolated from its context. It must be read in the light of the section in which it was inserted and other related statutes. And when viewed in that manner, there arises doubt in respect to the intent of Congress in effectuating the amendment. In the absence of ambiguity, resort may not be had to the legislative history of a statute for the purpose of construing it; but where there is ambiguity, recourse may be had to such legislative history as an aid in ascertaining the legislative intent. Gay v. Ruff, 292 U.S. 25, 54 S.Ct. 608, 78 L.Ed. 1099. In view of the ambiguity presented in this instance, it is appropriate to take into consideration the legislative history of the amendment as throwing light upon the Congressional intent in inserting the new language into the statute.

■ ■■ The bill as introduced, changes made in its framework in the course of passage, reports of committees in either or both branches of Congress, and reports of conference committees are parts of legislative history which may be taken into consideration in ascertaining the meaning of a doubtful statute passed by that body.

General debates in either or both branches of Congress are not appropriate sources of information from which to determine the intended meaning of the language of a statute. United States v. Trans-Missouri Freight Association, 166 U.S. 290, 318, 17 S.Ct. 540, 41 L.Ed. 1007; Dunlap v. United States, 173 U.S. 65, 75, 19 S.Ct. 319, 43 L.Ed. 616. But statements made by the chairman of the committee in charge of the bill stand upon a different footing, and may be resorted to under proper qualifications. United States v. St. Paul, Minneapolis & Manitoba Railway Co., 247 U.S. 310, 38 S.Ct. 525, 62 L.Ed. 1130.

Taking up the legislative history of the Crosser Act, the measure as introduced in the House of Representatives was for the purpose—stated in its title—of amending the Railroad Retirement Act, the Railroad Unemployment Insurance Act, and subchapter B of chapter 9 of the Internal Revenue Code; and for other purposes. Section 1 of the measure included in its definition of the term "employer" any person other than a carrier who, pursuant to arrangements with a carrier or otherwise, performs for hire any service with respect to passengers or property being transported by a carrier; also any person engaged in rendering, pursuant to arrangement with one or more carriers, any service which is of such nature as to be susceptible of continuous performance, and constitutes a part of or is necessary or incidental to the operation or maintenance of way, equipment or structures devoted to transportation use, or constitutes a clerical, sales, accounting, protective, or communications service necessary or incidental to the conduct of transportation carried on by a carrier, or is rendered with respect to passengers or property transported by railroad, at the point of departure or shipment, or at the point of destination, or between such points; and it expressly excluded from the term any individual performing service of that kind personally. Section 2 of the measure concerned itself with the definition of the term "employee" but until subsequently amended it did not contain anything which has significant bearing here. While the view was expressed in the course of

hearings before the House Committee on Interstate Commerce that the measure was largely in the nature of clarification of existing law in respect to coverage, it is clear that those who sponsored the legislation believed that independent contractors rendering service for railroad companies and those employed by such contractors were within the scope of the measure. Persons appearing before the committee in support of the measure stated without challenge by the author of the bill, the chairman of the committee, or any other member of the committee, that in their opinion such independent contractors and those rendering service for them were within the purview of the proposed legislation. And the bill passed the House in that form. It was stated in the report of the Senate Committee on Interstate Commerce that section 1 of the measure redefined the term "employer" by spelling out in more detail the application of the act to companies and associations which were a part of the railroad industry but were not technically carriers; that the principal objective in redefining the term was to settle controversies respecting coverage; and that the bill brought under the Railroad Retirement and Unemployment Insurance Acts two new groups of employers, namely, railroad-controlled trucking companies and those freight forwarders that were not then covered. It was further stated that many representations had been made to the committee that persons engaged in manufacturing, harvesting, storing, distributing, selling, or delivering refrigeration or ice to or into equipment used for refrigeration purposes in connection with the transportation of passengers or property were included in the term "employer," and that therefore their employees would be considered to be railroad employees. And it was further stated in blueprinted language that the committee desired to state categorically that there was no purpose or intent to include such persons as employers under the act; and that it was the unanimous understanding of the committee that such persons were not so covered. When the proposed legislation came before the Senate for consideration on its merits, there was extended debate in respect to coverage. The debate related primarily to coverage of independent contractors and their employees, such as those furnishing ice for the icing of cars. And, in the course of the debate, the chairman of the full committee on interstate commerce and the chairman of the subcommittee having immediate charge of the measure stated in unmistakable language that there was no intent or purpose to bring within the scope of the legislation independent contractors of that kind and their employees. One member of the committee taking an active part in the consideration of the bill stated that it was not the intent of members of the committee to bring such independent contractors and their employees within the act; but he further stated that despite their intent, he was concerned that section 1 would have that undesired effect. Later that member of the committee offered an amendment to strike the first section from the bill. And in connection with that proposed amendment, it was stated with seeming confidence that if the section were stricken, no change or departure from existing law would be made in respect to coverage of independent contractors and their employees rendering service for carriers. The amendment was adopted, and the first section stricken. The language hereinbefore quoted was inserted in section 2; after section 1 was stricken, section 2 became the first section; and the measure in that form was finally enacted into law.

■■ When the new language contained in the act is read in the light of its context, in the light of other related provisions of law, and in the light of the entire legislative history of the amendatory act, there is no sustainable basis for the contention that the added language was intended or designed to bring within the scope of the act an independent contractor such as Lamberg and his employees. While the bill as originally introduced was intended among other things to bring independent contractors of that kind and their employees within the purview of the legislation, and whatever the purpose of Congress may have been in other respects, the legislative history indicates clearly that the final action

of Congress represented a deliberate intent and purpose to leave such contractors and their employees outside the scope of the act insofar as employment taxes were concerned. And that ultimate Congressional intent and purpose being clear, courts are not free to construe the act otherwise.

The judgment is affirmed.